UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-CR-91 DRL-MGG |
| JOSHUA LEE METTS, | |
| Defendant. | |

OPINION & ORDER

The government charged Joshua Lee Metts with unlawfully possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). He asks the court to suppress all evidence from his arrest and law enforcement's subsequent search of his rental vehicle. He says officers lacked probable cause for the arrest and search in violation of the Fourth Amendment to the United States Constitution. The court held an evidentiary hearing on April 22, 2022.[1] *See* Fed. R. Crim P. 12(d); *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). The court now denies the suppression motion.

FACTUAL FINDINGS

Four Winds Casino South Bend sits on land owned in trust by the Pokagon Band of Potawatomi. On October 5, 2021, just after 1:00 p.m., surveillance captured a man, later identified as Joshua Lee Metts, sitting at a slot machine wearing black basketball shorts and a blue t-shirt [Ex. 5 Vid. 6 at 13:07:59]. At first there was nothing visible under his chair [*id.* 13:08:21].

He stood, moved slightly left, and then leaned right to cash out [*id.* 13:08:40]. As he did, a small white bag (later confirmed to have methamphetamine) fell from near his right pant leg and plopped on the ground just under the gaming chair near his right foot [Ex. 5 Vids. 1 and 6 at 13:08:41]. Though Mr. Metts challenged in his motion whether the bag actually came from him, and though

---

[1] Proceeding *pro se*, Mr. Metts nonetheless retained counsel for the purpose of this suppression motion.

these angles were not played during the evidentiary hearing, the surveillance video clearly shows the bag originating from Mr. Metts (*see, e.g.,* Figure 1):



**Figure 1**
**Frames from Surveillance Video**
**[Ex. 5 Vid. 1 at 13:08:41]**

Mr. Metts left the slot machine and walked to a casino ATM [Ex. 5 Vid. 1 at 13:08:52], with the small bag remaining under the chair [Ex. 5 Vid. 6 at 13:08:44]. ATM footage later aided in identifying Mr. Metts [Ex. 2 at 13:08:50; Tr. 17].

The small bag wasn't discovered immediately. An environmental services employee pushed in the chair shortly after Mr. Metts left but never noticed the bag on the floor now near the chair's rear right leg [Ex. 5 Vid. 6 at 13:09:57]. Another patron sat at the machine not long thereafter, played for a few minutes, and then left [*id.* 13:15:39-13:21:10]. The bag remained on the floor undisturbed and visible [*id.*]. A cleaning employee once again pushed in the chair but overlooked the bag—now positioned between the chair's back legs [*id.* 13:25:49].

2

Over the next approximate eight hours, sixteen patrons played the slot machine, and four environmental service employees pushed in the gaming chair. Through this time, the small white bag remained undisturbed and in view of the surveillance video.[2]

It wasn't until 9:37 p.m. that an environmental services employee discovered the bag [*id.* 21:37:51]. He picked it up thinking it was trash [Tr. 29-30], realized the bag was not trash [Tr. 34-36], dropped it (which landed in the walkway [Ex. 5 Vid. 6 at 21:28:07]), and kicked it to a center bank of machines, stepping on it and calling his supervisor [Tr. 30]. Security responded to the call [Tr. 40].

The security officer retrieved a rubber glove and Kleenex, picked up the bag, and took it to the medical room [Tr. 47-49]. He and his supervisor set the bag down in the medical room and waited outside the room's only door for tribal police, who already had been dispatched [*id.*].

Law enforcement arrived, entered the medical room, and retrieved the bag [Tr. 51]. Law enforcement received casino surveillance video [Tr. 7-8; Exs. 1-5]. Law enforcement determined that the bag contained narcotics and acquired a license plate number for a blue BMW associated with Mr. Metts from surveillance video [Tr. 56; Ex. 5 Vid. 11-2 at 14:25:00-14:29:39]. From the registration

---

[2] Though the court wonders why the parties had not performed this task before submitting over eight hours of video as evidence of nothing debatable, or stipulating to such facts, the court watched the lengthy videos submitted into evidence. From its review, the following timeline emerges. After Mr. Metts left, a patron sat at the chair, played the slots and then left [*id.* 13:37:38]. The bag remained undisturbed and visible [*id.*]. An environmental services employee came by and pushed in the chair, but the bag remained in the same spot [*id.* 13:39:10]. Two more patrons came, played, and left without disturbing the bag [*id.* 13:46:05-13:47:00; 13:50:37-14:01:15]. Mr. Metts returned to the machine at 2:11 p.m., played, and then left [*id.* 14:11:30-14:22:29]. Shortly after, another patron sat, played, and left [*id.* 14:23:27-14:25:30]. Next, a patron came, pulled some paper out of the slot machine, left it on the machine's console, and left [*id.* 14:29:54-14:30:01]. A short while later, a patron came, picked up the piece of paper, played, and left [*id.* 14:46:12-14:50:19]. An environmental services employee came by and pushed in the chair [Ex. 5 Vid. 7 at 15:00:22]. Seven more patrons came, played, and left [*id.* 15:03:44-15:07:11; 15:11:37-15:12:00; 15:43:19-15:45:10; 15:53:14-15:53:28; 16:04:03-16:05:40; 16:21:15-16:27:32, 16:45:06-16:47:59; Ex. 5 Vid. 8 at 17:03:58-17:11:46]. An environmental services employee pushed in the chair [*id.* 17:49:11-17:49:22]. The machine sat unused for about an hour until another patron came, played, and left [Ex. 5 Vid. 9 at 18:48:10-18:50:40]. An environmental services employee walked past and once more pushed in the chair [*id.* 18:58:52]. A patron came, leaned against the chair, played, and then left [Ex. 5 Vid. 10 at 21:26:07-21:27:41]. Throughout all this activity, the bag remained visible and undisturbed.

3

return, Officer Matthew Johnson identified the rental car as one owned by Hertz or one of its affiliates (Thrifty) [Tr. 56-57].

Officer Johnson went to the Hertz rental car agency in Mishawaka and spoke with the store's manager [Tr. 57]. The store manager informed the officer that the vehicle had been rented by Joshua Metts in Albuquerque, New Mexico over a month before [Tr. 57-58]. The vehicle had not been returned when scheduled, and the company had issued a repossession order [*id.*]. The branch manager said the company had no further contact with Mr. Metts documented on the rental account [Tr. 64]. The manager asked the officer to impound the vehicle should it be located [Tr. 58-59]. The manager provided his card and a copy of the rental agreement [Tr. 59; Ex. 6].[3] Law enforcement used "Joshua Metts" to obtain his driver's license and identify the individual in the surveillance video [Tr. 62].

That evening, tribal law enforcement confirmed that Mr. Metts had returned to the casino [Tr. 84]. Officer Sara Gainey had been advised about Mr. Metts, the drugs, and the rental car, and had been told to arrest Mr. Metts [*id.*]. She understood that the rental company wanted the vehicle returned [*id.*]. Working with casino security, Officer Gainey located Mr. Metts in the poker room and placed him in custody [Tr. 84-85].

When tribal police interviewed Mr. Metts, he said he had extended his rental agreement [Tr. 90]. After the interview, Mr. Metts was transported to jail, and Officer Gainey went to secure the blue BMW in the parking lot [Tr. 85-86]. Although tribal law enforcement intended to conduct an inventory search before towing the vehicle, Officer Gainey called a canine unit [Tr. 85, 90]. Officer Bradley Rajski and his police dog, Rodo, conducted a free air sniff around the vehicle [Tr. 86]. The canine alerted to the presence of narcotics in the vehicle [Tr. 86, 129-31; Ex. E].

---

[3] The court puts no stock in the idea that the officer had not actually received this rental record in the form of Exhibit 6, particularly when the branch manager testified he wasn't sure whether it would only be printed with "Thrifty" at the top from a Thrifty location and not also an affiliated Hertz location [Tr. 154-55], when the rental record came with the branch manager's Hertz business card [Tr. 157; Ex. 6], and when the branch manager has the ability to access the Thrifty records through his Hertz location [Tr. 157].

Law enforcement conducted a search and inventoried the vehicle [Tr. 96-98]. Officers discovered a SIG handgun, a small bag of methamphetamine (field tested) in the driver's side pocket door, needles, and a spoon with narcotic residue [Tr. 86, 95-96].

These facts serve as the court's initial findings. Additional findings follow in the course of the court's discussion of these legal arguments. Mr. Metts moves to suppress the night's evidence, arguing that there was no jurisdictional authority by tribal law enforcement to arrest him, no probable cause for his arrest, no policy-compliant inventory search, and no probable cause to search the vehicle.

## DISCUSSION

The Fourth Amendment to the United States Constitution establishes the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021); *United States v. Ochoa-Lopez*, __ F.4th __, 2022 U.S. App. LEXIS 10644, 6 (7th Cir. Apr. 20, 2022). As the text suggests, the Fourth Amendment's touchstone is reasonableness. *Lange v. California*, 141 S. Ct. 2011, 2018 (2021). It reasonably protects a person in his home and on the street, in his room and in his car. *Katz v. United States*, 389 U.S. 347, 350-51 (1967); *see also Terry v. Ohio*, 392 U.S. 1, 8-9 (1968).

The government normally must have a warrant to conduct a search—unless an exception exists. *See Vernonia School Dist. 47J v. Acton*, 515 U. S. 646, 653 (1995) ("[when] a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant"). A warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Riley v. California*, 573 U.S. 373, 382 (2014) (quoting *Johnson v. United States*, 333 U. S. 10, 14 (1948)). Absent a warrant, a search is reasonable only when it falls within a specific exception. *See id.*; *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

The government must prove an exception. When a warrantless search has occurred, the government bears the burden of proving compliance with the Fourth Amendment by a preponderance of the evidence. *United States v. Peters,* 743 F.3d 1113, 1116 (7th Cir. 2014); *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The government met its burden here.

    A. *Tribal Law Enforcement had Authority to Investigate and Arrest Mr. Metts.*

Mr. Metts first argues that the Pokagon Police Department had no authority to investigate or arrest him because he wasn't a member of the Pokagon Tribe. The government asserts that the Pokagon law enforcement officers were cross-deputized and otherwise had authority to investigate and detain non-tribe offenders on tribal land to transport them to the proper authorities.

The "sovereignty that the Indian tribes retain is of a unique and limited character." *United States v. Cooley*, 141 S. Ct. 1638, 1642 (2021) (citation omitted). The Pokagon Tribe lacks "inherent sovereign power to exercise criminal jurisdiction over non-Indians," though that power originates elsewhere at times, including through Congress. *See id.* at 1643. Mr. Metts has not cited any treaty or statute that has explicitly divested the Pokagon Tribe of its policing authority.

Instead, its authority comes from three sources. First, the "tribe [retains] inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* (emphasis omitted). This "health or welfare" allowance grants "a tribal police officer authority to search and detain for a reasonable time any person he or she believes may commit or has committed a crime," including non-tribal members. *Id.* at 1643, 1645. This authority permits the type of policing that occurred in this case.

Second, federal cross-deputization statutes grant many tribes, including the Pokagon Band of Potawatomi, authority to enforce federal law. This authority extends to carrying firearms, serving warrants relating to a federal crime committed on a reservation, making a warrantless arrest if the

6

crime is a felony and supported by probable cause, making inquiries of any person, and performing other law enforcement related duties, including as they relate to drugs. *See* 25 U.S.C. § 2803; 25 C.F.R. § 12.21 (special commissions issued to tribal law enforcement to obtain active assistance in enforcing applicable federal criminal statutes). Officers Johnson and Gainey had this authority [Tr. 55, 83].

Third, the Pokagon law enforcement officers were cross-deputized with the St. Joseph County Sheriff's Department to enforce state criminal statutes on and off tribal land, in addition to having authority to enforce federal law on reservations [*id.*]. *See, e.g.*, Ind. Code §§ 36-2-16-3(a), 36-2-16-4(4).

Taken together, these sources of authority allow tribal law enforcement to investigate a state crime committed on tribal land and in St. Joseph County, or a federal crime committed on tribal land; search and detain an individual believed to have committed a crime regardless of tribal status; and arrest an individual when probable cause exists that a felony has been committed. The argument that Pokagon law enforcement officers lacked the authority to investigate or arrest Mr. Metts under the circumstances here is thus wrong.

B. *Tribal Law Enforcement Had Probable Cause to Arrest Mr. Metts.*

The Pokagon law enforcement officers had probable cause to arrest Mr. Metts. "[P]robable cause justifies a search and seizure." *Whren v. United States*, 517 U.S. 806, 819 (1996). "Law enforcement officers have probable cause to arrest an individual when the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] [has] committed or [is] committing an offense." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (quotation omitted).

Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "does not require an actual showing of criminal activity, or even that the existence of criminal activity is more likely true than not." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations omitted). By definition, probable cause looks to probabilities—"examining the totality of the circumstances in

7

a common sense manner," *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003), and the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (citation omitted).

Probable cause is determined from reasonable conclusions drawn from the facts known to the officer at the time of the search or arrest. *Maryland* v. *Pringle*, 540 U.S. 366, 371 (2003). A law enforcement officer may act based on firsthand observations or the collective knowledge of law enforcement when officers communicate with each other. *United States. v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010); *United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007).

Methamphetamine possession is a state felony. *See* Ind. Code 35-48-4-6.1(a). The casino surveillance footage clearly depicts a small bag—later tested to be methamphetamine—falling from Mr. Metts onto an otherwise clean floor. This bag indisputably came from Mr. Metts. Perhaps even more to the point, Mr. Metts has adduced no evidence that would show that officers knew, based on trustworthy information within their possession at the time, that this bag came from someone other than Mr. Metts, or that they lacked a reasonable belief that it came from Mr. Metts. *See Kelley*, 149 F.3d at 646. The footage shows the small bag laying undisturbed for over eight hours, hidden by the chair from patrons but nonetheless visible to the surveillance camera.

Law enforcement also knew the bag contained methamphetamine. Video footage showed Mr. Metts walking to a blue BMW SUV, with a clearly-identified California license plate. From there, law enforcement acquired his name, information about the rental vehicle, his driver's license, and photographs to connect him with the bag and vehicle. When Mr. Metts returned to the casino the next day, these circumstances taken together were more than enough to establish probable cause to arrest him for possession of methamphetamine. *See Pringle*, 540 U.S. at 371; *Kelley*, 149 F.3d at 646.

Mr. Metts argues that casino employees tampered with the bag before it went into police custody. He offers no evidence of this. Indeed, the court's review of the security footage shows no

8

such tampering. The environmental services employee moved and kicked the bag to be sure, but it wasn't opened; and no evidence shows that kicking the bag magically changed the substance in the bag into methamphetamine or introduced it. The cleaning employee's conduct was visible by camera.

There is no evidence of tampering by law enforcement officers either. "When there is no evidence of tampering, a presumption of regularity attends the official acts of public officers in custody of evidence." *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994). "All the government must show is that reasonable precautions were taken to preserve the original condition of evidence[,] . . . even if all possibilities of tampering are not excluded." *Id.* The government did so here.[4] And for purposes of a probable cause assessment today, the mere allegation of tampering doesn't bear on the circumstances known to law enforcement at the time of the arrest or the reasonableness of the belief that a crime was committed. *See Pringle*, 540 U.S. at 371.

In short, the Pokagon law enforcement officers had probable cause to arrest Mr. Metts. Under the totality of the circumstances, specifically the surveillance video of the white bag falling from Mr. Metts, the drugs found in the bag, and the positive identification from his driver's license, the rental information, and surveillance video, law enforcement had a reasonable belief that a crime had occurred, and that Mr. Metts had committed it.

C. *Law Enforcement Had Authority and Probable Cause to Search the Rental Car.*

Mr. Metts argues that law enforcement lacked authority to search his rental vehicle without a warrant. He contends that the government cannot rely on the inventory exception and that the canine sniff of the BMW failed to provide officers probable cause for a search. The government responds

---

[4] In addition, breaks in the chain of custody and allegations of tampering go to weight, not admissibility. *See Kelly*, 14 F.3d at 1175; *see also United States v. Acox*, 595 F.3d 729, 733 (7th Cir. 2010) (motion to suppress is not a motion under the rules of evidence). There is no weight to give to this tampering theory because there is no evidence of it.

that the search was lawful because law enforcement was impounding the vehicle for its owner (Hertz or Thrifty), and officers had probable cause to search the vehicle after the canine alerted.

1. *Inventory Search.*

"Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006). "Searches conducted by the police prior to towing a car are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner[] charging them with having stolen, lost, or damaged his property." *Id.* (quotation and citation omitted). "The fact that an inventory search may also have had an investigatory motive does not invalidate it." *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996).

The Pokagon Band Tribal Police Department maintains standard procedures for towing vehicles after an arrest [Ex. B]. The policy dictates that, when a vehicle's owner or operator is arrested, "the arresting officer should provide reasonable safekeeping by leaving the vehicle secured and lawfully parked at the scene or, when appropriate, by having the vehicle towed" [*id.* § 502.4]. The policy lists examples of when it is appropriate to tow a vehicle: when the vehicle presents a "traffic hazard" or remains "in jeopardy of theft or damage if left at the scene," but notes that "[o]fficers are not required to investigate whether alternatives to towing a vehicle exist after an arrest" [*id.*].

The policy identifies four circumstances (three relevant here) when a vehicle should not be towed: (a) when the "vehicle can be legally parked, left in a reasonably secure and safe location and is not needed as evidence," (b) when the "arrestee or owner of the vehicle requests that it be released to a person who is present, willing and able to legally take control of the vehicle," or (c) when "the vehicle is legally parked and the arrestee or owner requests that it be left at the scene" [*id.*]. Overriding these circumstances, however, the policy requires that "[a]n officer who discovers a vehicle in the possession

10

of an individual who cannot establish the right to possession of the vehicle shall take and store[] the vehicle in a suitable place" [*id.* § 5.02.5.1].

Mr. Metts says he was the vehicle's operator, the vehicle was legally parked, and he had family members in the area who could come and retrieve it, so tribal law enforcement violated its towing policy by conducting an inventory search. Reading the towing policy's provisions carefully, the legal right of possession undergirds the enumerated circumstances under which a car should not be towed. Any other interpretation would be contrary to the policy's express terms [Ex. B § 502.5.1] and contrary to law. *See* Ind. Code § 9-22-1-5. This reading is also consistent with the general directive of the towing policy, which tells law enforcement to tow vehicles "when appropriate and in accordance with the law" [Ex. B § 502.2].

Mr. Metts has not established that he had legal possession of the vehicle, much less that he provided such evidence to law enforcement officers. He told officers he had extended the rental agreement, but he ostensibly gave them no evidence to substantiate this claim; and, as the record reveals, Mr. Metts dissembled at the suppression hearing on this point.

An officer has a right to impound a rental car legally and conduct an inventory search if a rental agreement has been violated. *United States v. Walton*, 827 F.3d 682, 688 (7th Cir. 2016). The rental agreement said the BMW was to be returned on September 8, 2021 [Exs. 6, A]. Law enforcement credibly believed that Hertz (Thrifty) wanted the vehicle back. It was overdue. Its rental term was not extended. Certain lawmakers have called for the Federal Trade Commission to investigate Hertz for "abysmal record-keeping" that at times has led to inaccurate stolen vehicle reports with law enforcement and false arrests of customers, or seemingly converted law enforcement into a repossession agent.[5] Mr. Metts raises the specter that this is such case. It isn't.

---

[5] *See, e.g.,* Letter from Sen. Richard Blumenthal, United States Senate, to Stephen Scheer, CEO of Hertz Global Holdings (Mar. 31, 2022), https://www.blumenthal.senate.gov/imo/media/doc/331.22hertzcartheft.pdf; Rich McHugh, *Whistleblower: Hertz Using Police as Repo Men, Prompting False Arrests*, NewsNow (Mar. 31, 2022)

Law enforcement had trustworthy information through the rental record that the vehicle was to be returned by September 8, 2021. Law enforcement also had trustworthy information from the Hertz (Thrifty) manager that the vehicle's rental had not been extended. On this record, the company made a legitimate request for law enforcement to impound the vehicle if it could be found. Nothing credible undercuts this reasonable understanding of law enforcement. The consequence is that Mr. Metts no longer had a legal right to possess the vehicle when he was arrested, and that law enforcement acted reasonably in conducting an inventory search before towing it. Indeed, law enforcement acted precisely according to its policy—"take and store[] it in a suitable place" [Ex. B § 502.5.1].

Mr. Metts counters that law enforcement violated the towing policy because he asked that the BMW be picked up by a family member in the area and because he had extended his rental. There are two problems with this argument. First, no family member was present. Second, Mr. Metts cannot credibly demonstrate he extended his rental agreement or substantiated this to law enforcement.

The towing policy allows for the arrestee to ask that the vehicle be released to a person "who is present, willing and able to legally take control of the vehicle" [Ex. B. § 502.4]. Mr. Metts testified that he told law enforcement that his family member could come and get the car—but there is no indication of who this family member was, if this family member had a valid driver's license, and the location of the family member relative to the car. The Fourth Amendment does not obligate law enforcement to sit and wait for such an alternative option, *United States v. Cartwright*, 630 F.3d 610, 615 (7th Cir. 2010), and indeed the towing policy indicates that officers are not required to investigate whether alternatives to towing exist [Ex. B. § 502.4].

Mr. Metts also testified that he informed law enforcement at the time of his arrest that he extended his rental period (though he never said for how long). A studied tour through the evidence

---

https://www.newsnationnow.com/us-news/whistleblower-hertz-using-police-as-repo-men-prompting-false-arrests/.

belies the claim that Mr. Metts extended his rental agreement, much less provided information to law enforcement that this occurred. At the suppression hearing, Mr. Metts presented a text message exchange to advance his claim. He made no showing that he gave this text message to law enforcement to aid his position.

Moreover, the circumstances of his alleged extension are ill-defined and rather incredible. The court credits neither Mr. Metts' testimony nor the screenshots of text messages between Mr. Metts and a number he says represents a Thrifty rental agent from New Mexico [Ex. F]. For starters, the phone number has a Delaware area code despite apparently coming from a New Mexico-based agent. Although not uncommon to see a company associating with Delaware, this raises suspicion.[6]

In addition, the text messages from this purported agent never once indicate who the agent is or whether he has any affiliation with Thrifty (or Hertz), as would be expected from a professional working at a major rental car company at an international airport. To that point, Mr. Metts presented perhaps an unintentional comparator message from a different Hertz representative—the individual notifying Mr. Metts that the BMW would be repossessed [Ex. G]. This message identifies Mr. Metts by name; identifies the rental vehicle; is clear, detailed, adequately professional; identifies the name of the investigator; and states the name of her employer (Hertz and Thrifty). It has all the features that the other text exchange lacks and makes the supposed rental extension text look manufactured.

To make matters worse, the messages that Mr. Metts testified, under oath, came from a rental agent are utterly incoherent. The messages use casual phrases, foreign to most professional exchanges, like "bro" and "wats up" and otherwise contain so many spelling mistakes from the purported agent that it becomes impossible to read—that is, impossible except to Mr. Metts. For example, one message sent at nearly 10:00 p.m. from the purported agent says, "Not the car bro, the number on the original

---

[6] The court is aware that Hertz is incorporated in Delaware and headquartered in Florida, and that Thrifty is incorporated in Oklahoma and headquartered in Florida. A Delaware incorporation for Hertz, not uncommon for companies at all, offers no explanation for this Delaware area code.

resets at ion paled I have u the 1st day" [*id.*]. Paraphrasing Shakespeare's *Julius Caesar*, this is Greek to the court, but Mr. Metts translated the message with ease while testifying, right down to explaining that "resets" meant "receipts" and that "at ion paled" meant "of the pile" [Tr. 181]—something that, on this record, the court believes only an insider to the manufacture of this text exchange could decipher.

Perhaps the only fact corroborating this story of a rental extension is that these text exchanges ostensibly occurred September 8 and 9 when the vehicle was otherwise due to be returned; but that feature alone doesn't establish that Mr. Metts was communicating with an agent about a rental extension and ultimately cannot bear the weight of his story. For instance, Mr. Metts testified that the very first message the agent sent ("We got BMW X1 now") was his first interaction with the agent, but this message lacks a date stamp that otherwise crowns the start of all new conversations on iMessage, never identifies the sender, and never identifies the purpose of the message, furthering diminishing its trustworthiness.

Curiously, no message comes from Mr. Metts after that first one from the purported agent for over a week when Mr. Metts, out of the blue and without ever saying he wants a rental extension, texts to this person, "Wats up don't forget I'm supposed to turn the car in at 9:30." Instead of begging the reasonable questions—who is texting this agent, what car is he referencing, and why is he telling the agent that he must return the vehicle—the purported agent merely says, "Send me a pic of the number. I'm busy." It was as if the agent knew exactly who was texting him and what the subject matter of the text was, but Mr. Metts testified that these were his only texts with the company [Exs. F, G], and he could not recall having any telephone conversation with the agent [Tr. 180]. This is all to say once more that this claim of a rental extension through these texts with some unknown and unnamed rental agent from New Mexico through a Delaware phone number, with no record of this extension maintained by the company, is wholly fantastical on this record.

Mr. Metts also points to an additional charge on one version of the rental receipt to show that he had an approved extension [*cf.* Exs. 6, A]. According to the documentation, this added charge ($275) reflects an overdue administration fee, not a rental extension. And then the fantastical becomes even more so. The original rental cost was $29 per day. At this rate, if Mr. Metts were to be believed, another $275 charge would only buy him about 9.5 more days of vehicle use—a far cry from the near month (27 days from September 8, 2021 to October 5, 2021) that he kept the car.

Leading then to the inevitable punchlines: nothing within these texts says the rental company approved a rental extension, and nothing on this record shows that Mr. Metts provided credible information (even these texts) to law enforcement so that officers understood he had a legal right to possess the vehicle at the time of his arrest. Officers had no reason to doubt the rental company's assertion that Mr. Metts had no legal right to possess the vehicle. Tribal law enforcement thus acted pursuant to its policy by towing and inventorying the BMW after officers arrested Mr. Metts. Officer Gainey may have testified that towing the vehicle would have violated other no-tow examples within the policy [Tr. 102-103], but not the provision that matters today. Here, the vehicle's owner informed law enforcement that Mr. Metts' right to possess the vehicle had lapsed and the company wanted the vehicle repossessed. Accordingly, pursuant to its policy and state law, law enforcement had to "take and store[] the vehicle in a suitable place" [Ex. B. § 502.5.1]. Law enforcement thus had a reasonable basis to conduct an inventory search, *see Walton*, 827 F.3d at 688; *Cherry*, 436 F.3d at 772, even assuming that Mr. Metts still had a privacy interest in a month-overdue rental vehicle (not yet deemed stolen) and thus standing to challenge the search, *see United States v. Walton*, 763 F.3d 655, 665 (7th Cir. 2014).

    2. *Canine Sniff.*

Mr. Metts also argues that the police canine (Rodo) wasn't adequately trained when it alerted to the presence of narcotics in the vehicle and thus didn't provide probable cause to search it. "An alert from an adequately trained and reliable dog is sufficient to give rise to a finding of probable

15

cause." *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015). Though a warrantless free air sniff may not occur in the area "immediately surrounding and associated with the home," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), "[a] dog sniff . . . that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment," *Illinois v. Caballes*, 543 U.S. 405, 410 (2005).

Mr. Metts argues that Rodo wasn't adequately trained or certified at the time of this sniff. A canine's "lack of a state certificate is not conclusive for federal constitutional purposes," particularly when his "lack of certification was attributable to an administrative error, not incompetence on the job." *United States v. Eymann*, 962 F.3d 273, 289 (7th Cir. 2020). The ultimate question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Florida v. Harris*, 568 U.S. 237, 248 (2013); *accord United States v. Simon*, 937 F.3d 820, 833 (7th Cir. 2019).

On this record, Rodo was trained and competent to identify narcotics, and his alert was reliable. The canine passed his certification test for marijuana, cocaine, heroin, and methamphetamine and successfully completed a 240-hour basic class that included detection of marijuana, cocaine, heroin, and methamphetamine just the year before this sniff [Ex. C]. The canine trained twice a month thereafter [Tr. 108], though the dog had been injured and at times trained less than the sixteen hours (total training hours) expected each month in 2021 [Tr. 112, 116; Ex. D].

The number of training hours might bear on the reliability of a different canine sniff, but not this one; and the mere variation from a training standard doesn't mean that the Fourth Amendment was violated. *See Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("Fourth Amendment's meaning [does] not change with local law enforcement practices—even practices set by rule."); *California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated . . . that whether or not a search is reasonable within

16

the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."); *Simon*, 937 F.3d at 833 ("But we need not address what Illinois law requires or whether [the canine] satisfies it because Illinois law does not control the Fourth Amendment.").

Officer Bradley Rajski, the dog's handler, also testified that Rodo's certification lapsed due to COVID-19 [Tr. 141], but he was recertified in December 2021 shortly after this October 2021 night [Tr. 141-142]. Nothing shows the canine's training was so subpar as to make his capabilities or alert unreliable, particularly when he had just completed a 240-hour course in 2020, received ongoing training in 2021, and earned recertification shortly after this sniff. *See Harris*, 568 U.S. at 248; *Eymann*, 962 F.3d at 289.

Mr. Metts points out other performance characteristics of his concern. For instance, he says the canine broke away from the vehicle during the sniff about the time of his third pass [Tr. 135; Ex. E], but it was merely once; and that isn't unusual given the people and traffic in the parking lot that evening [Tr. 139]. Mr. Metts also asserts that the canine wasn't reliable because he was rewarded every time in training and thus was conditioned to alert even absent the presence of narcotics. In actuality, the canine's field use underscores that he won't receive a reward merely for alerting; his alert in the field occurs without the promise of a reward, lending it further credibility [Tr. 132]. Mr. Metts last points to a previous false positive indication (not alert) this canine made during a traffic stop in a separate investigation [Tr. 119-20]. The circumstances there were different. This night Rodo not just indicated but then alerted by performing his trained response of sitting. The prior incident (involving no alert) speaks little to this occasion accordingly.

The sniff proved reliable based on this canine's training, video of his free air sniff, and Officer Rajski's testimony, now credited by the court. In particular, the canine here made several passes of the vehicle, designed to address wind shifts common to parking lots and to permit the canine to do low, medium, and high sniffs [Tr. 137]. The canine paused at the driver's side door and alerted eventually

at the rear passenger door. Before doing so, and eliminating any forceful argument that the canine had been improperly "cued" to alert by its handler, Officer Rajski released the leash before this alert. In addition, the officer began to step back from the canine toward the front of the BMW to see if the dog would break from his alert, but the dog remained [Tr. 129, 132; Ex. E]. Only when the officer walked toward his vehicle and called the canine did he break [Tr. 129, 131; Ex. E]. This alert may have been briefer than certain alerts by other dogs, but not materially so.

Mr. Metts presents the court with a decision of a sister court in Utah suppressing evidence obtained from a canine search, but there, among other behaviors of concern, the dog never objectively alerted to the presence of drugs. *See United States v. Jordan*, 455 F. Supp.3d 1247, 1253 (D. Utah 2020). The concerns from *Jordan* aren't materially replicated here—and foremost in differentiation, the canine this night alerted to the presence of drugs, and objectively so.[7] Once the canine alerted, law enforcement had probable cause to search the vehicle. *See Simon*, 937 F.3d at 833. The motion to suppress must be denied.[8]

## CONCLUSION

Tribal law enforcement had the authority to investigate Mr. Metts and had probable cause to arrest him and conduct a search of his rental vehicle, quite aside from its right to inventory the vehicle before towing and preserving the vehicle for its rightful owner. The court thus DENIES the motion to suppress [ECF 44].

SO ORDERED.

May 4, 2022                                              *s/ Damon R. Leichty*
                                                         Judge, United States District Court

---

[7] The court declines to consider as substantive evidence the transcript of testimony from Dr. Mary Cablk offered in *United States v. Jordan* (Cause No. 2:19cr125) and sustains the government's objection to that tender.

[8] In his *pro se* motion, Mr. Metts asked for a *Franks* hearing based on a search warrant issued to collect his DNA in furtherance of the investigation into this federal charge, but he abandoned this argument at the hearing, and it had no merit for the court to address.